469 A.2d 1078

**The WICKES CORPORATION d/b/a Wickes Lumber, Appellant,**

**v.**

**The NEWTOWN SAVINGS ASSOCIATION and Stephen Hearn, an individual, and William E. Worthington, Inc., and William E. Worthington, III, an individual.**

**The WICKES CORPORATION d/b/a Wickes Lumber**

**v.**

**The NEWTOWN SAVINGS ASSOCIATION and Stephen Hearn, an individual, and William E. Worthington, Inc., and William E. Worthington, III, an individual.**

**Appeal of NEWTOWN SAVINGS ASSOCIATION.**

Superior Court of Pennsylvania.

Argued April 14, 1983.

Filed Nov. 25, 1983.

Reargument Denied Jan. 31, 1984.

Richard D. Link, Doylestown, for appellant (at No. 1819) and for appellee (at No. 1959).

William F. Schroeder, Newtown, for appellant (at No. 1959) and for appellee (at No. 1819).

Ward F. Clark, Doylestown, for Worthington, appellees.

Before HESTER, POPOVICH and HOFFMAN, JJ.

POPOVICH, Judge:

On September 10, 1979, appellant, The Wickes Corporation (hereinafter Wickes), filed a Complaint in Trespass and Assumpsit against appellees, The Newtown Savings Association (hereinafter Newtown) and Stephen Hearn, president of Newtown.[1]  A non-jury trial was held in April and May of 1981, after which Wickes was awarded a verdict of $20,363.86 on its assumpsit claim.  Exceptions were filed on behalf of both Wickes and Newtown.  On May 26, 1982, the court below sustained one of appellant's exceptions and.

---

1. The other defendants named in the complaint were William E. Worthington, Inc., and William E. Worthington, III, as an individual. A non-suit in favor of the Worthington defendants was granted on the basis of discharge in bankruptcy.

increased the award to $21,563.86, with interest from the date of the filing of the complaint. Both Wickes and Newtown appeal from the judgment entered nunc pro tunc on January 24, 1983.

Wickes contends that the trial court erred in dismissing its trespass claims against Newtown and defendant Hearn. Wickes also argues that the trial court should not have limited its contract damage award to reimbursement for deliveries occurring only after August 15, 1978 and, that interest should be paid on the judgment from October 1, 1980.

Appellees contend that the trial court was correct in dismissing the trespass claims, but erred in awarding contract damages. We agree with the appellees and, accordingly, reverse the judgment below.

The facts of the case are as follows: Worthington, Inc. (hereinafter Worthington), by its principal, William E. Worthington, III, was engaged in the construction of a number of residential homes in Bucks County, Pennsylvania. The financing for a number of these buildings was obtained through construction loans issued by Newtown. In March of 1978, Wickes began supplying lumber and related building products to Worthington. However, Wickes advised Worthington that they could not extend significant credit to Worthington without assurance of security and payment. In compliance with this request, Worthington presented to Wickes a copy of a letter dated March 31, which was signed not only by Worthington but also by Stephen Hearn in his capacity of president of Newtown. The letter provided:

"Mr. Hearn,

In order to obtain enough credit to fulfill my framing lumber needs, I have made an agreement with Wickes Lumber, a division of the Wickes Corporation. It applies to the construction loans being held by Newtown Savings Association for William E. Worthington, Inc. in which Wickes Lumber will supply material.

a.) Newtown Savings Association will disburse the 2nd draw to William E. Worthington, Inc. in two checks made payable to William E. Worthington, Inc. One check to be in the amount owed to Wickes Lumber for that particular job; the other to be for the remainder of the draw.

b.) William E. Worthington, Inc. agrees to then endorse check and forward to Wickes Lumber in payment of lumber supplied.

Wickes Lumber is a new company I am dealing with and because of the large amount of money involved, they would feel more comfortable knowing where the money is coming from until I have established credit with them. Your signature below will be required by Wickes Lumber in order to insure that payment will be made as listed above. Thank you."

According to Wickes, an arrearage built up in Worthington's credit account, causing Wickes to cease supplying lumber to Worthington on August 14, 1978. So that deliveries would be resumed, Worthington presented to Wickes the following letter dated August 14, 1978 and signed by Mr. Hearn, as president of Newtown, and Mr. Worthington.

"Dear Mr. Hearn,

In order for me to procure the amount of lumber and windows needed to complete the new homes I am now constructing, it has been requested by the Wickes Lumber Corporation that a direct assignment be made due to the large amounts of money involved. Wickes would like Newtown to make a separate check payable directly to them from the third draw on the jobs. Upon my request for the draw, I will submit the amount due on that job to Wickes. Any jobs other than the ones listed here will need a separate letter giving Newtown permission to pay Wickes directly.

Listed below are the jobs that are presently scheduled from which the above payout will be as follows:

Lot 29 Limeport

Capetola Turk Road

Lot 8 Sugan Close"

When Wickes refused to resume deliveries on the basis of the August 14 letter alone, Worthington produced the following letter dated August 15, also signed by Mr. Worthington and Mr. Hearn, as president of Newtown:

"Dear Mr. Hearn,
    Please find four additional jobs listed below for which Wickes Lumber wants a direct assignment per the letter dated 8/14/78 to be paid upon the third draw on each job.
Bowers
Indian walk, Lot 1
Circle View Lot 1
Holmquist"

In reliance upon the letters of August 14 and 15, Wickes resumed deliveries of building materials to the Worthington job sites through September of 1978. In September, Worthington ran into financial difficulties with Newtown and Newtown took over control of various Worthington job sites. Newtown went to a voucher system for paying materials suppliers and subcontractors directly. Pursuant to this system, Wickes submitted two vouchers for $1200.00 which were paid by Newtown. However, Wickes never received any payments directly from Newtown pursuant to any prior arrangements.

Wickes' first argument is that it was fraudulently induced to extend credit to Worthington by the letters of March 31, August 14 and August 15, 1978. Wickes assumed from these letters that there were existing funds for each of the jobs that Worthington was working, and that Newtown would comply with the commitment to disburse checks representing particular draws. Wickes asserts that Newtown violated its duty to disclose the fact that at the time the March 31 letter was written, Newtown had already disbursed the entire proceeds of construction loans to Worthington on several job sites. Wickes also asserts affirmative misrepresentations on the part of Mr. Hearn based on his deposition of October 1, 1980. Mr. Hearn stated that at the time he signed the March 31 letter, he

"thought it was really kind of just a worthless piece of paper." (Deposition of Stephen G. Hearn, 10–1–80, p. 43). With respect to the August 14 letter, Mr. Hearn stated that he considered the letter to be a "guise on Worthington's part in order to get lumber to continue to be delivered." (*Id.* at p. 55). In support of its claim of actionable misrepresentation, Wickes quotes *Neuman v. Corn Exchange National Bank and Trust Co.*, 356 Pa. 442, 51 A.2d 759 (1947), as follows:

"One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from acting in reliance thereon in a business transaction is liable to the other for the harm caused him by his justifiable reliance upon the misrepresentation."

*Id.*, 356 Pa. at 450, 51 A.2d at 763. (quoting the Restatement, Torts, § 525).

In defense of the trespass claims of Wickes, appellees note that the March 31 letter does not refer to any particular lots for which loans may already have been paid out in full. Since Wickes was not Worthington's only supplier of lumber, (deposition of William E. Worthington, III, 10–23–80, pp. 21, 22), appellees argue that they did not have a duty to disclose the fact that some of the construction loans on various job sites were beyond the second draw stage.

Appellees also argue that Mr. Hearn's statement regarding his legal conclusion as to the validity of the March 31 letter as a binding contract is not sufficient evidence upon which tort liability can be based. Appellees assert that the fact that Mr. Hearn felt that the March 31 letter was a "worthless piece of paper" is not evidence that Newtown did not intend to make payments to Wickes. Aside from Mr. Hearn's testimony that Newtown would have paid Wickes according to the terms of the letter if they had been notified of amounts due, appellees argue that Wickes never insisted on compliance with the letter's terms. At the April 23, 1981 hearing, Wickes' witness testified that Wickes never received a Newtown savings check made payable to

Worthington and endorsed over to Wickes. (N.T. 4–23–81, p. 75). In fact, the record indicates that Wickes received 14 checks directly from Worthington and never contacted Newtown to inquire as to why the checks were not in compliance with the March 31 letter. (N.T. 4–23–81, p. 75).

Because Wickes never attempted to hold Newtown to the terms of the March 31 letter, they failed to show justifiable reliance on any misrepresentation as required under *Neuman v. Corn Exchange, supra.* Similarly, tort liability cannot be premised on the letters of August 14 and 15. Although Mr. Hearn did not believe that these letters constituted a contract between Newtown and Wickes, Mr. Hearn testified that Newtown would have paid Wickes for post-August 15 deliveries if it had received a bill. (N.T. 5–20–81, p. 36). This testimony is consistent with the trial court's finding that prior to September 28, 1978, Wickes had continued its practice of directing its collection efforts at Worthington and accepting periodic payments from Worthington. In response to Wicke's argument that several of the construction loans were already past the third draw stage when the August 14 letter was written, Mr. Hearn testified that Wickes could have been paid out of the fourth or fifth draw. (N.T. 5–20–81, p. 77). This testimony is consistent with the lower court's finding that the "third draw" language was not a condition of Newtown's obligation to Wickes. Thus, there is sufficient evidence to negate a finding of fraud.

> "It is not this Court's function to weigh evidence or pass upon the credibility of witnesses, *Commonwealth ex rel. Brown v. Brown,* 195 Pa.Super. 324, 171 A.2d 833 (1961). It is rather fundamental to our law that it is the exclusive province of the fact-finder to determine the question of the credibility of witnesses and the weight to be accorded their testimony. *In re Holtz' Estate,* 422 Pa. 540, 222 A.2d 885 (1960); *Cherry v. Wolf,* 205 Pa.Super. 484, 210 A.2d 917 (1965). Thus, absent manifest error or a finding that the judgment or decree is arbitrary and capricious, we are bound by the lower court on issues of credibility

and weight of the evidence. *Contakos v. Contakos*, 204 Pa.Super. 445, 205 A.2d 619 (1964)."

*Leibowitz v. Ortho Pharmaceutical Corp.*, 224 Pa.Super. 418, 429, 307 A.2d 449, 456 (1973). For the above stated reasons, we affirm the trial court's finding of insufficient evidence of fraud.

The second issue is presented by way of Newtown's cross-appeal, by which Newtown contends that Wickes should have recovered nothing on its Complaint in Assumpsit. The court below found that the August 14 and 15 letters created a binding contract to which Wickes was the intended third party beneficiary. Newtown contends that it is not liable for deliveries pursuant to the letters of August 14 and 15 because it was never notified by Worthington of any amounts due to Wickes.

In *Hillbrook Apartments, Inc. v. Nyce Crete Co.*, 237 Pa.Super. 565, 352 A.2d 148 (1975), this court discussed the definition of a third-party beneficiary contract:

"To be a third party beneficiary entitled to recover on a contract it is not enough that it be intended by *one* of the parties to the contract and the *third person* that the latter should be a beneficiary, but *both parties to the contract* must so intend and must indicate that intention in the contract; in other words, a promisor cannot be held liable to an alleged beneficiary of a contract unless the latter was within his contemplation at the time the contract was entered into and such liability was intentionally assumed by him in his undertaking; the obligation to the third party must be created, and must affirmatively appear in the contract itself: *Klingler v. Wick*, 266 Pa. 1, 5, 6, 109 A. 542, 543 (1920); 17 C.J.S.Contracts, § 519(c) pp. 1127–1130; 12 Am.Jur. 831, 832, § 280; 833, 834, § 281. [Footnotes omitted.]" (Emphasis supplied)

*Id.*, 237 Pa.Superior Ct. at 571–72, 352 A.2d at 151. (*quoting Spires v. Hanover Fire Insurance Co.*, 364 Pa. 52, 70 A.2d 828, 830 (1950)). In the instant case, the lower court found that the letters of

August 14 and 15 met the above definition.[2]  We agree that Newtown obligated itself in the August letters to pay Wickes directly, but find that such payments were expressly conditioned on notice from Worthington of the amounts to be paid to Wickes.  The letter provided, in pertinent part: "Wickes would like Newtown to make a separate check payable directly to them from the third draw on the jobs. Upon my request for the draw, *I will submit the amount due* on that job to Wickes."

In *Bobali Corporation v. Tamapa Co.,* 235 Pa.Super. 1, 340 A.2d 485 (1975), we reviewed the canons of construction to be utilized by the courts of this Commonwealth in construing the terms of a contract.  We stated:

> "In construing the terms of a contract we are guided by well-defined and fundamental canons of construction. Our Supreme Court has adopted the following principles:
>
> '... "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles." (Citations omitted.)  "Contracts must receive a reasonable interpretation, according to the intention of the parties at the time of executing them, if that intention can be ascertained from their language. (Citing cases." ' *Percy A. Brown & Co. v. Raub,* 357 Pa. 271 at 287, 54 A.2d 35, at 43 (1947).

Also see *Unit Vending Corp. v. Lacas,* 410 Pa. 614, 190 A.2d 298 (1963).  Moreover, in ascertaining intent effect must be given to all the provisions of the written contract.  *Robert F. Felte, Inc. v. White,* 451 Pa. 137, 302 A.2d 347 (1973).  'In a written contract the intent of the parties is the writing itself and when the words are clear and unambiguous the intent is to be determined only from the express language of the agreement.' *R.F. Felte, Inc. v. White,* supra, 451 Pa. at 143, 302 A.2d at 351; *East*

---

**2.** The court below limited Newtown's liability to those deliveries occurring after August 15, 1978.  We agree with the court below that it is clear that the August 14 and 15 letters show no intention on Newtown's part to pay for materials delivered prior to that date.

*Crossroads Center, Inc. v. Mellon-Stuart Co.,* 416 Pa. 229, 205 A.2d 865 (1965). A corollary rule is that '[t]he parties [have] the right to make their own contract, and it is not the function of this Court to rewrite it, or to give it a construction in conflict with the accepted and plain meaning of the language used.' *Hagarty v. Wm. Akers, Jr., Co., Inc.,* 342 Pa. 236 at 239, 20 A.2d 317, 319 (1941); *R.F. Felte, Inc. v. White,* supra."

*Id.,* 235 Pa.Superior Ct. at 5–6, 340 A.2d at 488.

In the case *sub judice,* the court below ignored the statement in the August 14 letter that Worthington was to instruct Newtown as to the amount due to Wickes. Rather, the court held that since Newtown was aware that construction was continuing, Newtown should have been on notice to inquire as to whether deliveries were being made by Wickes. The trial court stated that Wickes' efforts in seeking payment from Worthington rather than Newtown did not indicate a waiver on Wickes' part. We find such an interpretation of Newtown's obligation under the August 14 agreement clearly inconsistent with the express terms of that agreement. As we said in *Bobali, supra,* it is not the function of this court to rewrite a contract or give it a construction in conflict with the accepted and plain meaning of the language used. The fact is that Worthington never notified Newtown of the amount owed to Wickes. Although Wickes may not have contemplated such nonfeasance on Worthington's part when they resumed deliveries in reliance on the mid-August direct payment agreement, Newtown's obligation to Wickes was clearly conditioned on receiving notice from Worthington of the amount due to Wickes.

Because Worthington never indicated to Newtown the amounts it was to pay Wickes, Newtown cannot be held liable on an "inquiry-notice" theory. Thus, the letters of August 14 and 15 cannot be used to justify the verdict below. In finding Newtown liable for all post-August 15 deliveries, the court below found that Wickes complied fully with the terms of the September 14 voucher system letter

sent by Newtown to Worthington and then distributed to subcontractors. In an apparent effort to have us reduce the verdict should Newtown have been found liable on the August 14 and 15 letters, Newtown argues that it should not be held liable for post-September 14 deliveries by Wickes to Worthington. In light of our disposition of the issues presented by the August letters, we need not address Newtown's argument that Wickes did not comply with the terms of the September 14 letter.

For the above-stated reasons, we reverse the judgment below.